## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. 23-cv-339** |
| **APPROXIMATELY 3,972,017 PAXOS** ) | |
| **STANDARD TOKENS SEIZED FROM** ) | |
| **PAXOS TRUST COMPANY** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, the United States of America, by and through the United States Attorney for the District of Columbia, and brings this verified complaint for forfeiture in a civil action *in rem* against the defendant property, to wit 3,972,017 Paxos Standard Tokens ("PAX"), a digital currency backed by the U.S. dollar (*i.e.*, a stablecoin[1]), which Paxos Trust Company ("Paxos"), a U.S.-based virtual currency exchange, transferred to law enforcement custody pursuant to a seizure warrant dated October 25, 2022, under case number 22-sz-25 (the "Defendant Funds"). In further support of its cause, the plaintiff alleges as follows:

---

[1] As described in further detail below, stablecoins are digital assets that may be pegged to a currency like the U.S. dollar or to a commodity's price, such as gold. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

## NATURE OF THE ACTION AND DEFENDANT *IN REM*

1.      This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI") into an online wire fraud and access device fraud committed in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1029, respectively. Specifically, the criminal investigation arises from the unauthorized procurement and transfer of approximately $160 million in digital assets from the virtual currency wallet of Wintermute, LLC ("Wintermute"), a foreign-based virtual asset service provider. The Defendant Funds, which amount to a fraction of the funds stolen from Wintermute, were transferred from Paxos to law enforcement on or about November 17, 2022, pursuant to a seizure warrant issued in case number 22-sz-25.

2.      For the reasons set forth below, the Defendant Funds are subject to forfeiture as property constituting or derived from proceeds traceable to violations of wire fraud and access device fraud, pursuant to 18 U.S.C. § 981(a)(1)(C).

3.      The Defendant Funds are currently in the custody of the FBI in the District of Columbia.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345, because it has been commenced by the United States, and by virtue of 28 U.S.C. § 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

5.      Venue is proper in this District by virtue of 18 U.S.C. § 3238 and 28 U.S.C. § 1395(a), (b) & (c) because the underlying offenses are subject to prosecution in the District of Columbia and because Defendant Funds have been brought into and are currently located in the District of Columbia.

2

## STATUTORY FRAMEWORK

### I.     Wire fraud

6.      This civil forfeiture action relates to violations of 18 U.S.C. § 1343, which makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

### II.    Fraud and related activity in connection with access devices

7.      This civil forfeiture action relates to violations of 18 U.S.C. § 1029(a)(1), (2), and (5)These subsections of section 1029 make it a crime to knowingly and with intent to defraud use one or more counterfeit access devices; or to knowingly and with intent to defraud use one or more unauthorized access devices during any one-year period, and by such conduct obtain anything of value aggregating $1,000 or more during that period; or to knowingly and with intent to defraud effect transactions, with one or more access devices issued to another person or persons, to receive payment or any other thing of value during any one-year period the aggregate value of which is equal to or greater than $1,000.

8.      The term "access device," as defined in 18 U.S.C. § 1029(e)(1), includes any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device,

3

to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

**III.    Forfeiture Statutes**

9.     Under 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from "proceeds" traceable to certain offenses, including violations of 18 U.S.C. § 1029 (Fraud and related activity in connection with access devices), and any offenses constituting "specified unlawful activity." The term "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), including cross reference to 18 U.S.C. § 1961(1), includes violations of 18 U.S.C. § 1343 (Wire fraud).

## FACTS GIVING RISE TO FORFEITURE

**I.    Background related to virtual currency**

10.     **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Bitcoin (or BTC) and Ether (ETH) are currently the most well-known virtual currencies in use.

11.     **Stablecoins:** Stablecoins are a type of virtual currency pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. PAX is a stablecoin that is centrally managed by Paxos, in that Paxos is the token manager (*i.e.*, the owner of the smart contract) and also the treasury for PAX (*i.e.*, the entity responsible for keeping funds in reserve that back PAX).

12.    **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to or from which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

13.    **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder(s) of an address's private key can authorize a transfer of virtual currency from that address to another address.

14.    **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (*i.e.,* a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

15.    Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

16.    **Blockchain**: The code behind many virtual currencies requires that all transactions involving that virtual currency be publicly recorded on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by a decentralized network of computers and using that blockchain's technology, containing an immutable and historical record of every transaction. The blockchain can be updated multiple times per hour and records every virtual

currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

17.     **Blockchain Explorer**: These explorers are online tools that operate as a blockchain search engine.  Blockchain explorers enable users to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

18.     **Decentralized Finance (DeFi)**: Decentralized Finance, or DeFi, is an umbrella term for financial services on public blockchains, primarily the Ethereum network. The Ethereum network's native virtual currency is ETH. Ethereum was the first blockchain to offer various decentralized services within its network. To make these services possible, the Ethereum network allows other tokens besides ETH to run on the network. These tokens (*i.e.*, non-ETH tokens) are known as ERC-20 tokens.

19.     DeFi is a term used to describe a financial system that operates without the need for traditional, centralized intermediaries. Instead, DeFi platforms offer an alternative financial system that is open for anyone to use and that allows centralized intermediaries to be replaced by decentralized applications (or dApps). With DeFi, a person can obtain many of the financial services that banks typically support—such as earn interest, borrow, lend, buy insurance, trade derivatives, and trade assets—but accessing DeFi can be a faster process than opening a bank account and does not require paperwork or a third party. DeFi is global, peer-to-peer (*i.e.*, interactions take place

directly between two users rather than being routed through a centralized system), pseudonymous, and open to the public.

20.     **Virtual Currency Exchanges (VCEs)**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC, ETH, and PAX. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (*i.e.*, "know your customer" or "KYC" checks) and to have anti-money laundering programs in place.

21.     **Blockchain Analysis:** It is virtually impossible to look at a single transaction on a blockchain and immediately ascertain the identity of the individual behind the transaction. That is because blockchain data generally consist only of alphanumeric strings and timestamps. But law enforcement can obtain leads regarding the identity of the owner of an address by analyzing blockchain data to figure out whether that same individual is connected to other relevant addresses on the blockchain. To analyze blockchain data, law enforcement can use blockchain explorers as well as commercial services offered by several different blockchain-analysis companies. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020). Through

numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

## II.     Overview regarding the hack and the theft of funds from Wintermute

22.     On or about September 20, 2022, a hacker or hackers initiated an online exploit that allowed them to gain unauthorized access to Wintermute's virtual currency wallet.

23.     On or about September 20, 2022, after initiating that online exploit, the hackers stole over $160 million in digital assets from Wintermute's wallet.

24.     Wintermute is a UK-based proprietary trading firm that specializes in algorithmic trading of digital assets. Historically, Wintermute used Profanity, an Ethereum vanity address generating tool. While most Ethereum wallet addresses are generated randomly (*i.e.*, a user is assigned a random alphanumeric string), Profanity allows its users the ability to create vanity addresses containing a chosen name, word, or phrase somewhere within the address. Vanity addresses are created by calculating many different public/private keypairs and identifying one that meets the criteria set forth by the user. In other words, instead of getting a string of random letters and numbers as a user's virtual currency wallet address, Profanity allows users to choose their own address, containing a user-specified string of letters and numbers.

25.     In early 2022, public reports flagged a vulnerability in Profanity's automatic address generating tool that would allow attackers to recover private keys from any vanity address generated with Profanity. According to these reports, the vulnerability stemmed from Profanity's alleged generation of its private keys using a cryptographic pseudorandom number generator (or CPRNG) seeded with an unsigned integer, or whole numbers without a sign (0, 1, 2, 3, etc.), meaning that there were only $2^{32}$ possible seed values, or roughly 4.3 billion. While this number seems large, this

algorithm was insufficient to maintain security against a brute force attack. This reporting estimated

that an attacker could theoretically brute force the private keys of certain vanity addresses generated

by Profanity within a few months. In subsequent reports, researchers realized that such a brute force

attack could occur much faster than originally projected.

26.     In or around September 2022, after being notified of the vulnerability, Wintermute

stopped using Profanity's tool to generate addresses, moved to a more secure script for key

generation, and gradually began retiring its "old keys" that had been generated using Profanity.

Wintermute, however, had not completed the process of retiring Profanity generated keys by the

time of the attack.

27.     On or about September 20, 2022, Wintermute was alerted that its Profanity-generated

wallet used for DeFi proprietary trading operations had been compromised and that approximately

$160 million worth of digital assets had been drained from the Profanity-generated wallet.

Wintermute's research into the incident revealed that an unknown individual or individuals

("hackers") had discovered Wintermute's private keys through the Profanity exploit described above

and had accessed Wintermute's wallet without authorization.[2]

28.     More specifically, on or about September 20, 2022, between approximately 5:03 a.m.

and 5:47 a.m. UTC, the hackers used Wintermute's private keys without Wintermute's authorization

to initiate transactions out of Wintermute's wallet, under the false and fraudulent pretense that the

hackers were the legitimate owners of the Wintermute funds, and the hackers sent the Defendant

Funds from Wintermute's wallet to an unhosted virtual currency address outside Wintermute's

---

[2] Evidence collected thus far indicates that the hacker(s) were likely located abroad when this Profanity exploit was deployed. For example, a significant number of IP address connections that are tied to the deployment of the exploit are traceable to servers abroad.

control. Law enforcement has yet to identity the owner/controller of that unhosted virtual currency address. In conducting these transactions, however, the unknown hackers caused to be transmitted by means of wire communication in interstate or foreign commerce writings, signs, and signals in the form of transaction announcements broadcast across the networks for each of the stolen cryptocurrencies, including BTC, ETH, and PAX.

29.     Of the $160 million, hacker(s) stole approximately $120 million worth of the stablecoins USDC and Tether (or USDT), $20 million worth of BTC and ETH, and $20 million in other coins, including approximately 3,972,017 PAX tokens (*i.e.*, the Defendant Funds).

30.     As previously stated, Paxos is a U.S.-based virtual currency exchange that acts as the token manager and treasury for PAX tokens. In this context, acting as the token manager and treasury for PAX means that Paxos controls (1) the smart contract that creates PAX tokens and (2) the reserve assets held to back each minted PAX token available on the market. Paxos's role as token manager and treasury enable Paxos to modify the smart contract for PAX to "freeze" PAX tokens contained in an unhosted wallet address. Once those tokens are "frozen," Paxos can "burn" (*i.e.*, render unusable) the PAX tokens in that crime-linked unhosted virtual currency address. Finally, pursuant to a warrant, Paxos can reissue the same amount of PAX tokens that have been burned (*i.e.*, mint new PAX tokens) to an address in law enforcement's control.

31.     On or about September 23, 2022, using this freeze/reissuing capability, Paxos worked to freeze (via wire communications across blockchains) the Defendant Funds in the unhosted virtual currency address, pending the receipt of a seizure warrant or other appropriate legal process.

32.     On or about October 25, 2022, Magistrate Judge Moxila A. Upadhyaya signed a warrant under case number 22-sz-25, authorizing the seizure of the Defendant Funds.

33.     On or about November 17, 2022, Paxos transferred the Defendant Funds to law enforcement custody. That transfer was initiated by Paxos in New York.

### COUNT ONE – FORFEITURE
**(18 U.S.C. § 981(a)(1)(C))**

34.     The United States incorporates by reference the allegations set forth in Paragraphs 1 through 33 above as if fully set forth herein.

35.     The Defendant Funds are property constituting or derived from proceeds traceable to wire fraud, and access device fraud in violation of 18 U.S.C. § 1343, and 18 U.S.C. § 1029, respectively.

36.     Accordingly, the Defendant Funds are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that notice issue to the Defendant Funds; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Funds be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: February 7, 2023
　　　　Washington, D.C.


　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　MATTHEW M. GRAVES
　　　　　　　　　　　　UNITED STATES ATTORNEY
　　　　　　　　　　　　D.C. Bar No. 481052

　　　　　　　　　　　　 /s/ *Pravallika Palacharla*
　　　　　　　　　　　　Pravallika Palacharla
　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　Illinois Bar No. 6313672
　　　　　　　　　　　　United States Attorney's Office
　　　　　　　　　　　　601 D Street, N.W.
　　　　　　　　　　　　Washington, D.C. 20001
　　　　　　　　　　　　Telephone: 202-252-7829
　　　　　　　　　　　　Email:pravallika.palacharla@usdoj.gov

## <u>VERIFICATION</u>

I, Christopher Wong, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this <u>7th</u> day of February, 2023.


*/s/ Christopher Wong*
Christopher Wong
Special Agent
Federal Bureau of Investigation